The Martin Brothers Box Company v. Commissioner.
Martin Bros. Box Co. v. Commissioner
Docket No. 110397.
United States Tax Court
1943 Tax Ct. Memo LEXIS 351; 1 T.C.M. (CCH) 999; T.C.M. (RIA) 43190; April 22, 1943
*351 Nolan Boggs, Esq., and Bruce Winchester, Esq., 828 Nicholas Bldg., Toledo, Ohio, for the petitioner. Lawrence R. Bloomenthal, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves income taxes in the amount of $17,259.32 and declared value excessprofits tax in the amount of $1,564.65, both for the calendar year 1939. Deficiencies were determined by the Commissioner in the above amounts. The only question presented is whether sums received by the petitioner during the calendar year in settlement of litigation constituted taxable income. From evidence, both documentary and oral, we make the following findings of fact. Findings of Fact 1. The petitioner is an Ohio corporation, having its principal place of business at Toledo, Ohio. Its return for the calendar year 1939 was filed with the collector for the tenth district of Ohio. 2. Petitioner was at the time of trial and had for some years been engaged in the manufacture and sale of shipping containers made of corrugated paper board, and wooden and wirebound boxes. The manufacture of corrugated paper boxes started about the middle or latter part of 1933. The petitioner had *352 a plant in Toledo, Ohio, and one in Aurora, Indiana. The latter was placed in operation in the fall of 1933. About $300,000 was spent upon machinery for the purpose of manufacturing corrugated paper board. The capacity of such machinery was between 25 and 30 million square feet of corrugated paper board per month, requiring about 1,500 tons per month of manufacturing material. 3. On January 31, 1934, petitioner entered into a contract of purchase, and a contract of consignment with Southern Kraft Corporation (hereinafter called Kraft). The first provided that Southern Kraft would sell to the petitioner 1,500 tons per month of Kraft board for the manufacture of corrugated board in sheet form; that the contract should run from February 1, 1934, to January 31, 1937, and from year to year thereafter, "unless either party gives written notice on and before January 1st of any year that it elects to terminate the agreement on January 31st of such year"; that delivery prices, according to a schedule contained in the contract, depended upon the price received for the manufactured article; that delivery was to be at petitioner's plant at Aurora, Indiana, upon consignment. The consignment contract *353 provided for remittance of invoice price of merchandise used, to the consignor on the 25th of each month. 4. About November 1934, the contract of January 1934 was changed, effective November 1, 1934, by an oral arrangement that the petitioner should pay the lowest price that was received by the Southern Kraft Corporation for the same grade of material. 5. The petitioner put on an extensive selling campaign and a sales force, and built up its business after the contract of January 1934. By the spring of 1935 it had developed the business to between 18 and 23 million square feet per month. 6. In the spring of 1935, the officials of Kraft told the petitioner's president that the petitioner must cut down its requirements of manufacturing material to 10 or 12 million square feet per month. Petitioner's president informed Kraft officials that that would hurt petitioner's reputation and business. From that time on petitioner received on the average of 600 to 1,000 tons of manufacturing material per month from Kraft. For two months it went to about 1,100 tons. The result of Kraft's failure to deliver 1,500 tons per month was the loss of accounts, good will and salesmen by the petitioner. *354 Petitioner's production was cut down to as low as 40 per cent. The petitioner could not make delivery or meet competition. Its business in corrugated board was damaged, also its business in wooden containers. It had to close up a warehouse and a sales force and office in St. Louis, a sales force and office in Chicago, and an office in Louisville. 7. The petitioner continued to buy its manufacturing material from Kraft until about 1937. The contract did not require it to buy from Kraft alone. No attempt was made to purchase petitioner's requirements anywhere else until 1937. Almost daily demands were made upon Kraft to furnish petitioner's requirements. 8. Rather than admit it did not have manufacturing material, the petitioner raised its prices to customers. This forced the volume of business down. The petitioner in its Federal income tax returns, reported net income of $47,599.40 for 1934; $38,195.07 for 1935; $47,228.67 for 1936, and $14,301.71 for 1937. 9. On the 7th day of October, 1937, Kraft filed suit in the Court of Common Pleas of Lucas County, Ohio, against petitioner for $89,402.06, allegedly due upon account for goods, wares and merchandise sold and delivered at the *355 defendant's request. On December 6, 1937, an answer was filed by the petitioner. In substance, it consisted of a general denial, a claim for $11,557.94 as a credit against Kraft's claim, because of difference between the cost the defendant was forced in 1937 to pay for Kraft board and the contract price at which it was alleged Kraft agreed to deliver; and because of flood damage in 1937 which it was alleged Kraft had agreed to adjust. The answer also set up the contract of January 31, 1934, alleged that it was still in full force and effect, but that the prices had been modified about November 1, 1934, to be prices equal to the lowest prices charged by Kraft to other customers; and that from that date to October 1, 1937, large quantities of material had been purchased from Kraft. The amounts alleged purchased were approximately 569 tons per month in November and December 1934; 854 tons per month during 1935; 930 tons per month during 1936; and 479 tons per month for the first nine months of 1937. It was alleged that because of violation of such agreement and sales by Kraft at lower prices to others, the petitioner had been overcharged and damaged a total of $288,780.11, for which *356 amount judgment was prayed; the answer further prayed judgment for $55,230 because of alleged failure to receive from Kraft cartage of $2 per ton which had been received by other customers of Kraft; also judgment in the sum of $106,429.81 on the allegation that the petitioner had failed to receive a 7 per cent credit which had been received by other customers of Kraft; therefore the defendant, the petitioner herein, prayed judgment for a total of $461,997.86. 10. On or about February 11, 1938, petitioner filed an amended answer, the contents of which were, in effect, the same as in the first answer, with the addition that estoppel was pleaded against the plaintiff's denying the alleged change of contract to a price basis the same as that of other customers of Kraft. As in the first answer, judgment was prayed for in a total sum of $461,997.86 upon the same grounds as set forth in the original answer. A second amended answer and a cross-petition were filed by the defendant, the petitioner herein, on August 4, 1938, wherein it was alleged that Kraft had delivered 19,232 tons less material than it had agreed to deliver, and that The defendant during said period had succeeded in building *357 up a large and profitable business and this defendant needed all of said stipulated quantity of said material as set forth in said contract, for use in its business and for which it had a ready and expanding market. After allegations of the same matters contained in the original and first amended answer, totaling $461,997.86, it was further alleged, in effect, that Kraft had conspired to, and had, violated the Anti-Trust laws of Ohio. In this connection it was alleged, in substance, that the plaintiff and others, including corporations organized by the plaintiff and in which the plaintiff and its officers were financially interested, refused to supply the petitioner with its contract requirements of 1,500 tons of merchandise per month, and devoted such goods to corporations in which such parties were financially interested at prices lower than those charged to the petitioner herein, "whereby said competitors to defendant [this petitioner] were at a great and unlawful advantage over defendant, and defendant's business was cramped, limited and made less profitable." It was further alleged that the conspirators * * * prevented this defendant from obtaining business which it otherwise *358 would have gained, by secret influence, collusion, and coercion with defendant's customers, by restricting the supply of materials furnished by plaintiff to the defendant as aforesaid, by charging defendant an excessive price for such materials as it did furnish to the defendant, by forcing defendant to give up a large and valuable part of the business that had been worked up and enjoyed by the defendant, by charging the defendant such an excessive price for the materials furnished by the plaintiff to the defendant that the defendant could not compete with other members of said trust and conspiracy except at a loss, by coercing this defendant into limiting and restricting its output and the territory within which defendant could sell its products, all in violation of plaintiff's contract "A" as modified as hereinbefore mentioned, and all in violation of law, including the provisions of the Valentine Anti-Trust law of the State of Ohio, being Sections 6390 to 6402 of the General Code of Ohio, all of said acts and things being to the damage of this defendant in the sum of Two Hundred Fifty Thousand ($250,000.00) Dollars, for which the defendant asks double damage against the plaintiff *359 in the sum of Five Hundred Thousand ($500,000.00) Dollars. WHEREFORE defendant prays judgment against plaintiff for $11,557.94, as set forth in its second defense; for judgment in the sum of $288,780.11, as set forth in its cross petition in the first cause of action thereof; for judgment in the sum of $55,230.00, as set forth in the second cause of action of said cross petition; for judgment in the sum of $106,429.81, as set forth in the third cause of action of its cross petition; and for judgment in the sum of $500,000.00, as set forth in the fourth cause of action of said cross petition; in all the total sum of $961,997.86, with interest as prayed herein, and for its costs herein expended. 11. On March 16, 1939, petitioner herein as defendant in such litigation filed its third amended answer and cross-petition. The allegations thereof were, in effect, the same as those set forth in its second amended answer and cross-petition, except that an allegation of fraud and unjust enrichment of the plaintiff was added to the previous allegations of overcharge with reference to the item totaling $288,780.11, and the item of $55,230 for cartage, and an allegation of unjust enrichment was *360 added as to the item of $106,429.81. Judgment was prayed upon each of the same items represented in the second amended answer and cross-petition totaling, as therein, $961,997.86. 12. On or about September 29, 1939, Kraft filed its reply to the defendant's third amended answer and cross-petition and denied in detail all of the matters therein set forth, attaching as exhibits to its reply and answer copies of letters as follows: A letter of May 21, 1934, to the petitioner, stating that the petitioner was endeavoring to use the consignment stock on matters other than those covered by the contract, that such was not in accord with the contract, and that while Kraft was "willing at present to cooperate with you, it must be understood that the use of any portion at present of this consignment stock which is not in accord with the contract will not in any means prejudice the rights of the contract. * * * will not act as a precedent and will not in any way interfere with the rights of the contract"; also, a letter of November 23, 1934, inter alia, stating (with reference to prices confirmed for November and December 1934) "It has been understood between us that our activity along these *361 lines will not in any way prejudice the rights of our contract with you, and as a matter of record will you please confirm this letter to that effect"; also, a letter from the petitioner to Kraft dated November 26, 1934, accepting receipt of Kraft's letter of November 23, 1934, confirming the statements therein and stating "also wish to confirm that this arrangement will in no way jeopardize the rights of the present contract with you. Thanking you for your kind indulgence, I remain * * *." It was specifically denied that Kraft had ever promised or agreed to give to Martin Brothers a price as low as the lowest price charged by Kraft to its other customers, but that it had been agreed that prices would be comparable with those charged selected customers and that such arrangement had been fully complied with. It was further alleged that a total of $1,515,815.57 material had been furnished to and priced to Martin Brothers, of which they had paid $1,426,413.51, leaving a balance due of $89,402.06, for which judgment was prayed. All other matters in petitioner's third amended cross-petition were denied. 13. Kraft together with a large number of other companies was indicted for violation *362 of the Sherman Anti-Trust Act in the District Court of the Southern District of New York on July 20, 1939, and on September 10, 1940, a civil complaint was filed in the same court against Kraft and others, charging unlawful combination and restraint of trade. A consent decree of injunction was entered on the same date. 14. Upon November 3, 1939, Thurman Arnold, Assistant Attorney General of the United States, wrote a letter to Percy R. Taylor, who was counsel for the petitioner, in substance to the effect that he, Arnold, had been informed that Taylor's clients had considerable evidence supporting the allegations of a cross-petition against the Southern Kraft Corporation, and that offer had been made to make this evidence available to the Government; that the offer was appreciated and the department expected to avail itself thereof, and that it was desired that a conference be arranged. This letter was exhibited to counsel for Kraft shortly thereafter. After several conferences between counsel, the litigation was compromised and settled between the parties, and on December 6, 1939, the plaintiff and defendant therein each executed to the other a release of all matters between them. *363 The release from the petitioner releases not only Kraft, but also International Paper Company, International Paper and Power Company, and the officers and directors of those companies; also Vern F. Gransden and Raymond Bee (officers of Kraft). The mutual releases executed by Kraft and the petitioner were very broad in scope, covering generally and particularly all manner of claims, reciting inter alia "release of all claims and demands whatsoever in law or in equity," also all "causes of action, suits, debts, dues," including any claims of the petitioner "upon or by reason of any matter, cause of action or thing whatsoever, from the beginning of the world to the day of the date of these presents, including (but not limited to) all causes of action referred to in the cross-petition of the said Martin Brothers Box Co. in case No. 151079 in the Court of Common Pleas of Lucas County, Ohio;" and in the conferences between counsel for the parties, there was no breakdown or allocation of the amount paid in settlement, nor discussion of good will. 15. Petitioner received from Kraft $100,000 cash, a credit memorandum covering Kraft's account, $88,140.56, and a refund of $65 court costs. *364 On December 11, 1939, a journal entry was filed in the Court of Common Pleas of Lucas County, Ohio, reciting that by agreement of the parties the case is "settled and dismissed, with prejudice, both as to plaintiff's petition and the defendant's cross-petition and all causes of action therein contained." Opinion The question before us here is simple: Was the money received by the petitioner as compromise and settlement of its litigation with Kraft nontaxable capital replacement, as argued by petitioner? The burden is upon the petitioner to demonstrate error by the Commissioner in determining it to be taxable income. Although the evidence adduced is voluminous, we think that two facts upon which there is no disagreement are dispositive of the case. These facts are, first, that the litigation, as shown both by the pleadings and the evidence, involved various items and claims, particularly for over-charges and credits because of breach of contract, and damages by violation of the Ohio Anti-Trust Law; and second, that the settlement was general, for a lump sum, there being no agreement for allocation of the funds paid. Stating the matter more in detail, the petitioner set up in its *365 original answer credits of $11,557.94 against Kraft's claim by virtue of difference between the contract price of material and the price it had to pay, and by virtue of Kraft's agreement to make an adjustment of petitioner's cost of use of damage materials; also, over-charges totaling $288,780.11, because of Kraft's contract to allow it the same treatment as to other customers; also, a credit of $55,230.00 claimed because of cartage allowed by Kraft to other customers; and $106,429.81 claimed because of a 7 per cent discount allowed by Kraft to other customers. The above items are set up in separately numbered defenses, the total being $461,997.86. Though the petitioner filed three amended answer-cross-petitions, the above items remain separately numbered, pleaded and prayed for throughout the pleadings; in addition to which, in the second and third amended answer-cross-petitions, there is alleged a cause of action because of violation of the Valentine Anti-Trust Law of Ohio, to the damage of the petitioner in the amount of $250,000, for which, because of a statutory provision for double damages, $500,000 is asked, making, in the second and third amended pleas, a total of $961,997.86 *366 prayed for, itemized as above set forth. The case was settled for a lump sum of $100,000 and court costs and the execution by Kraft of a credit memorandum canceling and releasing its account against petitioner. The language of the mutual releases executed is almost all inclusive and covers in general and with great particularity all claims and demands whatsoever "from the beginning of the world" in law or in equity, which each party has or might have against the other, "including (but not limited to) all causes of action referred to" in the case filed by Kraft. Each release recites the release of damages, but neither release contains any language with reference to capital, good will or damage to business. In the face of such a cross-action and such a settlement, we find ourselves permitted by neither law nor logic to hold that petitioner's recovery was only for capital replacement, and so nontaxable. When all things between the parties to the suit and some other parties are covered by the settlement, how may we determine whether all are capital in their nature? Perhaps many elements, wholly unrelated to capital, were settled. Not merely cause No. 151079 is settled, but all other *367 things of all other nature in addition to which, for the consideration received, petitioner releases corporations and persons not plaintiffs in the action, against whom no claim of damage of any kind appears. For what, then, was the petitioner paid? This question alone would appear to suggest sufficient bar to a conclusion that the moneys received were only for damage by Kraft to petitioner's good will and business; but in addition, and within cause No. 151079, out of $961,997.86 prayed, $461,997.86 is asked as credits and overcharges - directly based upon contract pleaded, and as relief based thereon. These items, on the face of their pleading, constitute no damage to the capital of the petitioner, its good will or business, but are in the nature of deferred income. By what formula may we, then, allocate the $100,000 cash and the credit memorandum among the various items separately and specifically sued for, upon contract on the one hand, and the $500,000 for violation of the antitrust law on the other? It is to be noted that definite amounts of damage are prayed for, on each item, and that among several appears the one of $500,000 for double damages for violation of anti-trust law. *368 The petitioner urges strongly that the settlement was capital for damage to business and good will because it came promptly after Kraft had been shown the letter from the Attorney General, expressing interest in the Kraft-Martin Brothers case, and appreciation of the offer of assistance. But if we assume connection between letter, trust prosecution, and settlement, we think we may regard it as recently the Supreme Court of the United States in , considered that business motives leading to cancellation of debt were not significant, and did not prevent a holding of gratuity. At any rate, it is obviously impossible to ascribe the settlement of all of the above items, both specifically and most broadly stated, within or without of the litigation pending, and covering other parties, to the one element of violation of anti-trust law by Kraft. In we considered this precise question. There two suits were filed, each upon a claim for $50,000, one for breach of contract, resulting in interference with good will, with resultant damage; and *369 one for unfair competition resulting in damage to business. Both were settled, for appreximately $15,000. The Commissioner included that amount in income. We said, among other things, in considering the argument that the sum represented damages to good will: The amount in question was paid to the petitioner in compromise and settlement of two suits, and there is no evidence to indicate in what proportion the amount could be allocated between the actions. Also, there is no evidence to establish the specific purpose for which the money was paid, other than that it was paid as a lump sum in compromise and settlement of the litigation. Whether the amount represented damages for wrongful injury to the petitioner's good will, or whether it represented damages for loss of profits, or indeed whether the amount was simply paid by the defendants to avoid further expense and harassment resulting from long continued litigation, does not definitely appear. Though we did not put the decision solely upon inability to allocate the amount received, but upon the evidence, we said that we were "unable to conclude that the plaintiff there was seeking damages only for alleged injury to its good will." *370 We think the paragraph just quoted lays down a salutary and inescapable criterion - that we may allocate a lump sum received upon settlement, between capital and non-capital matters which are charged in the allegation and for which damage is separately prayed. Recently, in , we considered a situation parallel in most respects to that here involved, found many matters, definite and indefinite, including action for violation of anti-trust laws as here, all settled for a lump sum, and concluded that the amount received could not be ascribed to capital replacement only. We hold the same in the instant matter. Also, regardless of inability to apportion the lump sum received, upon consideration of all of the pleadings and the evidence, we are of the opinion that the recovery was not in the nature of capital replacement. Very little, if anything, is found in the pleadings to set out damage to good will, reputation and business setup. The words "reputation" and "good will" are nowhere found therein and it is clear, as evidenced by the fact that the violation of anti-trust law was not mentioned in the first two pleas *371 filed by the petitioner, that petitioner's primary position was based upon breach of contract. It is true also that the petitioner was in nowise obligated not to purchase its requirements of manufacturing material from others than Kraft, yet it did not attempt so to do earlier than 1937. Under such circumstances it is clear that the petitioner's measure of damages against Kraft was the difference between the contractual price at which Kraft agreed to deliver and the price which the petitioner was forced to pay others for the same material. Indeed, this difference is the basis of the petitioner's claim for certain sums with reference to material purchased by it in 1937. In other words, what petitioner lost was the difference in the profit it would have made had Kraft complied with its contract. It is apparent that the gravamen of petitioner's answer-cross-action against Kraft was breach of contract. Had Kraft complied with its contract, no cause of action would have been left to the petitioner. It was said in : * * * Had the stock been delivered as agreed, or had the petitioner then received its *372 equivalent in money or other property, according to the terms of its contract it would have derived income. This language is applicable clearly to the situation here, for had the manufacturing material been delivered as agreed, petitioner would have derived income, and we therefore quote again from the same case as follows: * * * But where the basis of the compromised claim is not an injury to capital but default in the payment of money or delivery of property which would clearly have been gain in the first instance, the settlement cannot be said to be in restoration of capital. We think, therefore, that the petitioner's case against Kraft must be seen to rest upon contract, and mere breach of contract is not damage to capital. It is true that the petitioner charged violation of the Ohio Anti-Trust Act and that the gist of that Act permitting suit for damages is that one may be "injured in his business or property." Section 6397, Ohio General Code. Nevertheless we think that a violation of that Act does not per se constitute damage to capital, and that it might well consist merely of prevention of profit-taking. The Supreme Court of Ohio seems to take that view, for in , *373 the action was based upon a violation of that Act, it being alleged that there was monopoly "entailing upon plaintiff in error a heavy loss in trade and profit on account thereof." No element of damage to reputation or good will appeared. The court not only entertained the action but took the view that the relation between the parties was contractual and without contract no cause of action would have arisen. It thus appears that the language of the Ohio Anti-Trust statute is broad and that a mere reliance thereon by the petitioner in litigation with Kraft does not indicate a plea of damage to capital structure. The petitioner in its Second and Third Amended Answers and Cross-petitions alleged with reference to the materials which Kraft had contracted to deliver: The defendant during said period had succeeded in building up a large and profitable business and this defendant needed all of said stipulated quantity of said material as set forth in said contract, for use in its business and for which it had a ready and expanding market. In the above language the petitioner was, as shown by the language just preceding, referring to the period from November 1, 1934, to March 31, 1937 - *374 practically the entire period covered by the litigation. If the petitioner had during that period succeeded in building up a large and profitable business and had a ready and expanding market, any injury suffered is more properly considered as to loss of profits than to damage to reputation, good will or business, for it seems obvious that Kraft's actions had merely prevented the building up of a bigger and more profitable business - in other words, had deprived the petitioner of profits anticipated. Indeed, the above language cannot be reconciled with a ruined business. We think the business did in fact increase, at least until 1937, and that breach of contract, damage as to which might have been mitigated by purchase of materials elsewhere, was the cause of any injury, rather than violation of antitrust laws. Such damages are not capital in nature. Viewing the pleading as a whole and considering the evidence adduced, it is our opinion that this is a matter of settlement of a loss of anticipated profits and not of damage to capital, good will or reputation, that no part of the amount received in compromise can be allocated to capital replacement, and that no error is shown in the *375 determination that the amount received in compromise was taxable. Decision will be entered for the respondent.